**Adrienne GILANIAN, Plaintiff,**

**v.**

**CITY OF BOSTON, Suffolk County, Richard J. Rouse, Mary Poe, Jane Doe, Defendants.**

**Civil No. 01–11580–NG.**

United States District Court, D. Massachusetts.

May 18, 2006.

David J. Breen, City of Boston Law Department, Kathleen M. Cawley, Suffolk County Sheriff's Department, Boston, MA, for Defendants.

Stephen B. Hrones, Michael L. Tumposky, Hrones & Garrity, Boston, MA, for Plaintiff.

## MEMORANDUM AND ORDER RE: SUPPLEMENTAL BRIEFING ON SECOND MOTION FOR SUMMARY JUDGMENT

GERTNER, District Judge.

### I. INTRODUCTION

This case stems from two strip-searches of the plaintiff, Adrienne Gilanian ("Gilanian"), conducted in March 2000 while she was held in pre-trial detention at the Nashua Street Jail ("the Jail"). The plaintiff alleges that the two searches violated her right, guaranteed by the Fourth Amendment, to be free from unreasonable searches and seizures. She makes claims against the City of Boston, Suffolk County, Suffolk County Sheriff Richard Rouse, and two unidentified Suffolk County corrections officers.

Previous orders in this case have disposed of many of the plaintiff's claims.[1] Most recently, on August 30, 2005, I issued

---

1. In her complaint, Gilanian sought damages under both 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, § 11(I). On April 30, 2002, the Court dismissed all claims against the City of Boston because it had no role in promulgating or implementing the customs or policies at Nashua, and because a city cannot be sued under the MCRA. On May 20, 2002,

a Memorandum and Order denying defendants' motion for summary judgment on liability for the second strip-search, but granting it as to defendant Rouse's request for qualified immunity. I also denied plaintiff's cross-motion for summary judgment, pending additional briefing on whether a 2001 change in the defendants' policy from strip-searching to segregation could be used as evidence that segregation was feasible in March 2000, and therefore that a less restrictive alternative was available, rendering the second strip-search unconstitutional. I directed the parties specifically to the question of whether Fed. R.Evid. 407 bars the admission of evidence of the policy change, or whether the policy change might be admissible to show feasibility.

The parties have now filed their supplemental briefs. As I explain below, I conclude that, while Rule 407 does not prohibit introduction of the policy change evidence, this evidence also does not dictate entry of summary judgment for the plaintiff on the constitutionality of the second strip-search.[2] I therefore leave intact my earlier **DENIAL** of the plain-

tiff's cross-motion for summary judgment [docket entry # 37]. This case will now proceed to trial on the limited set of questions I outline below.

## II. FACTUAL BACKGROUND

I have summarized the facts of this case elsewhere, and will not repeat that summary here. For the purposes of this decision, however, it is useful to highlight the circumstances surrounding the second strip-search.

Gilanian was first admitted to the Nashua Street Jail on March 15, 2000. The Jail is classified as a maximum-security facility, as it houses detainees awaiting trial for all crimes, including capital offenses. She was strip-searched when she arrived, spent the night in a cell with another inmate, and showered and ate the next morning. Several hours later she was strip-searched a second time in preparation for transportation to court to answer a warrant for assault with a dangerous weapon, a violent felony. I have previously determined that Gilanian mingled with other inmates to some extent and could have had access to contraband during her stay at the Jail.[3]

the Court dismissed the MCRA claims against Suffolk County and Rouse because a municipality cannot be sued under the MCRA and a claim against Rouse in his official capacity would constitute a claim against the County. In addition, the Court barred a claim against Rouse in his individual capacity because Gilanian had not alleged that he had personally engaged in any unlawful acts against her. Finally, in a Memorandum and Order dated June 3, 2004, the Court dismissed all claims against the two unidentified Suffolk County corrections officers because, nearly two years into the suit, the plaintiff had not identified (and therefore not served) them.

2. As I explain below, any suggestion to the contrary in my August 30, 2005, opinion was an overstatement.

3. In my August 30, 2005 Memorandum and Order, I observed on pages 15 and 16:

Plaintiff contends that, even assuming defendants' security concerns to be legitimate, she was kept apart from the general jail population and thus had no opportunity to acquire contraband between the first and second searches. If this were true, it might well diminish defendants' security interest to the point of warranting summary judgment against them. However, defendants maintain that all detainees were integrated into the general population when plaintiff was in custody. And, in her deposition, Gilanian indicates at least some exposure to other inmates. Thus, evaluating the ... evidence in the light most favorable to defendants, summary judgment cannot be granted in plaintiff's favor under the theory that she was separated from the general population during her detention.

The second strip-search was conducted pursuant to a Jail policy that all inmates be searched prior to transport to court.[4] According to the defendants, this policy was later changed in 2001 in reaction to a decision by the First Circuit, *Roberts v. Rhode Island,* 239 F.3d 107 (1st Cir.2001). Since the policy change, pretrial detainees like Gilanian have been kept segregated from the general population, obviating the need for successive, pre-transportation strip-searches.

The details of the second strip-search are also relevant. The plaintiff alleges that a female corrections officer searched her in a private room, but in the presence of at least four other women, including one inmate. The defendants admit that the plaintiff may have been searched in the presence of another inmate.

## III. *LEGAL ANALYSIS*

*Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) supplies the framework for analyzing the second strip-search. To be constitutional, the search must have been reasonable as to Gilanian. As the *Bell* court explained:

> In each case, [the analysis of reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.* at 559. *Bell* therefore instructs courts to consider four factors in assessing reasonableness: scope, manner, justification, and place.

I concluded in my August 2005 Memorandum and Order that the scope of the second search and the place where it was conducted were both acceptable. The only questions that remained concerned the second search's justification—specifically the question of whether a less restrictive alternative existed at the time of the second strip-search—and manner. Though I denied summary judgment in my August 2005 Memorandum and Order, I required additional briefing on whether evidence of the Jail's subsequent policy change, a possible less restrictive alternative, might be used to attack the search's justification. After reviewing the parties' supplemental briefs, I now evaluate the questions left open by my August 2005 Memorandum and Order: justification and manner.

### A. *Justification*

■ The First Circuit employs a two-pronged approach to analyze the justification for a strip-search. *See DeToledo v.*

---

**4.** Defendants contend that the strip-search policy was mandated at the time by the Code of Massachusetts Regulations, Massachusetts Department of Correction policy, and the Suffolk County Sheriff's Department Policy S530. The Code of Massachusetts Regulations states that strip-searches may be employed when inmates are transported "to and from court/medical trips/visits." Mass. Regs.Code tit. 103, § 924.06(2)(b) (West 2005); *see also* Massachusetts Department of Correction, No. 103 DOC 506.04.1. (2004) ("strip searches may be employed ... before and after court...."). These searches are to be conducted "in relative privacy with as much dignity as possible and by two security personnel of the same sex as the inmate, except in an emergency." *Id.* § 924.06(2); *see also* Massachusetts Department of Correction, No. 103 DOC 506.04.2.A. ("Strip searches of individual inmates should be conducted in relative privacy usually by two security personnel, rendering as much dignity to the situation as possible."). The Suffolk County Sheriff's Department Policy states that "[i]nmates being transported from a Department facility will undergo a complete strip search, including visual inspection of body cavities. Searches will be conducted by transporting officers of the same gender as the inmate." Suffolk County Department Policy, S530, § II.G.

*County of Suffolk,* 379 F.Supp.2d 138, 148 (D.Mass.2005) (explaining the development of strip-search law in the First Circuit). On the one hand, a search is justified if corrections personnel possess particularized reasonable suspicion that the individual searched poses a danger. Reasonable suspicion may be in the form of observation of the inmate with contraband; it may also be satisfied merely by the fact of a violent felony charge. *Roberts,* 239 F.3d at 112–113.

On the other hand, if corrections personnel lack particularized, individualized reasonable suspicion, they may nevertheless conduct a strip-search pursuant to a blanket search policy if that policy is properly justified by other considerations. Those considerations include the type of crime with which a group of inmates is charged, the institution's history of contraband and safety problems, the existence or lack of less restrictive alternative policies, the characteristics and dangerousness of the jail or prison population, and the questions of whether the inmates to be searched have mingled with the general jail population or had contact with outside visitors. *Id.; see also Ford v. Suffolk County,* 154 F.Supp.2d 131, 139–41 (D.Mass.2001) (declaring a blanket strip-search policy unconstitutional; reviewing multiple "justification" factors).

No single consideration trumps the others. In fact, courts have specifically cautioned against placing too much weight on the "mingling" and "less restrictive alternative" considerations. *Id.* at 113; *see also Turner v. Safley,* 482 U.S. 78, 90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (emphasizing the deference afforded to corrections administrators' judgments regarding corrections operations; discouraging courts from relying exclusively on a least restrictive alternative test).

Because the second strip-search of the plaintiff at the Nashua Street Jail was conducted pursuant to a blanket policy, not in reaction to any particularized suspicion, the Court's evaluation of the search's justification will take into account the multiple considerations outlined above. The existence of a less restrictive alternative is one such consideration, and the Jail's 2001 policy change from strip-searching to segregation—potentially a less restrictive alternative—may therefore be relevant. Accordingly, in my August 2005 Memorandum and Order, I ordered additional briefing on the subject of the policy change and the application, if any, of Fed.R.Evid. 407's restrictions on the use of "subsequent remedial measure" evidence. Before reaching the question of the second strip-search's justification, therefore, I will consider Rule 407.

### 1. *Federal Rule of Evidence 407*

Federal Rule of Evidence 407, entitled, "subsequent remedial measures," states:

When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

After considering the parties' supplemental briefs, I now conclude that Rule 407 does not apply, and does not bar admission of evidence of the Jail's policy change for any purpose, including as proof of the existence or lack of a less restrictive alternative. I therefore do not need to address the questions of whether the feasibility

exception applies, and whether feasibility has been controverted as the Rule requires.

As a threshold matter, it is clear that Rule 407's applicability is not limited to products liability cases. Indeed, the parties agree that the Rule applies with equal force to changes in policy as it does to product modifications and revised safety procedures. *See Specht v. Jensen*, 863 F.2d 700, 701 (10th Cir.1988) (excluding, under Rule 407, a statement of remedial steps to be taken in an illegal search suit brought pursuant to 42 U.S.C. § 1983); *In re Air Crash Disaster*, 86 F.3d 498, 532 (6th. Cir.1996)(characterizing a change in policy as "a subsequent remedial measure within the meaning of Fed.R.Evid. 407"); *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417 (9th Cir.1986) (excluding evidence of a police department investigation as a subsequent remedial measure in a civil rights suit brought pursuant to 42 U.S.C. § 1983).

 It is altogether less clear, however, that the Rule requires exclusion of policy changes made not in response to a sense of social responsibility or a desire to remedy an injury, but rather in response to the dictates of a higher authority. The Advisory Committee Notes to Rule 407 explain that the Rule's shielding of subsequent remedial measures has its roots in "a social policy of encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety."

As the Fifth and Tenth Circuits have held, the Rule's protection does not extend past the limits of this underlying social policy. In *Rozier v. Ford Motor Co.*, the court refused to apply the Rule to exclude subsequent remedial measure evidence where a report on design modifications "was not prepared out of a sense of social responsibility but because the remedial measure was to be required in any event by a superior authority ..."[5] 573 F.2d 1332, 1343 (5th Cir.1978); *see also Underwriters at Lloyd's London v. OSCA, Inc.*, No. 03–20398, 2006 WL 941794 (5th Cir. Apr.12, 2006) (unpublished) (upholding trial court's admission of a post-accident "corrective action report" required by defendant's voluntary trade organization; noting that, though the issuance of the report was not strictly required, the reasoning in *Rozier* "with regard to the social policy behind Rule 407 does have some applicability").

Likewise, in *Herndon v. Seven Bar Flying Service, Inc.*, the court stated, "Where a superior authority requires a tort feasor to make post-accident repairs, the policy of encouraging voluntary repairs which underlies Rule 407 has no force—a tort feasor cannot be discouraged from voluntarily making repairs if he *must* make repairs in any case." 716 F.2d 1322, 1331 (10th Cir. 1983) (emphasis in original).

In the case at bar, the defendants have described their policy change three separate times as a reaction to, and required by, the First Circuit's decision in *Roberts*, which held unconstitutional a Rhode Island policy of strip-searching all prison inmates upon admittance. In their Memorandum in Support of their Motion for Summary Judgment, for example, the defendants stated, "Subsequent to the decision in *Roberts*, detainees, such as the plaintiff who were committed to the Jail pursuant to Mass. Gen. L. ch. 276 § 29 were not transferred to general population [and later strip-searched] and remained overnight in the booking room." In its Supplemental Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, defendant

---

**5.** The *Rozier* court's decision was also driven by the fact that the "measure" taken was not "subsequent." The report at issue was prepared prior to the accident that gave rise to the lawsuit. *Rozier,* 573 F.2d at 1343.

Suffolk County explained similarly, "The [policy] change was effectuated as a result of the First Circuit's ruling in *Roberts v. Rhode Island,* 239 F.3d 107 (1st Cir.2001)." Def.'s Supp. Mem. in Opp'n. to Pl.'s Mot. for Summ. J. p. 1. Later in the memorandum, the defendant stated again, "The change in policy resulted from a change in the law, not as a result of any civil action initiated by the Plaintiff or anyone else." *Id.* at 4.

Thus, according to the defendants themselves, the shift from strip-searching to segregation was prompted by a new development in the law that governed strip-searching at the Jail. The change was required by a higher authority, as in *Rozier, OSCA,* and *Herndon,* and was not motivated by some concern for the constitutional rights of the detainees housed in the Jail. Because the "social policy" underlying the Rule does not extend to the policy change at the Nashua Street Jail, therefore, I conclude that the protections of Rule 407 do not apply, and evidence of the policy change is admissible for any reason.

## 2. *Evaluation of Justification*

█ I now turn to an evaluation of the justification for the second strip-search of Gilanian. In my August 2005 Memorandum and Order, I examined some of the considerations commonly reviewed by courts assessing a blanket strip-search policy. I evaluated the Jail's history of contraband and safety problems during the transportation of inmates to court, but concluded that the history is ambiguous. Though I did not analyze in depth the questions of type of crime, mingling, the characteristics of the Jail's population, and outside visitor contact, I did note that the

plaintiff was charged with a violent felony, that she did mingle to some extent with the general population, that the Jail is a maximum security facility, and that the plaintiff had no outside visitor contact.

I then addressed the question of a less restrictive alternative, linking the admissibility of the Jail's policy change to the ultimate question of the case. I stated that, if the policy change were admissible, I would conclude that a less restrictive alternative was available at the time of the second strip-search, and that the Jail's failure to implement that policy rendered Gilanian's second strip-search unjustified and unconstitutional. In retrospect, this formulation of the question swept too broadly. I now conclude that, though evidence of the policy change is admissible, and is relevant to the existence of a less restrictive alternative and, ultimately, the justification for the search, it is not dispositive.

This conclusion is informed by the procedural posture of the case. Before me is the plaintiff's cross-motion for summary judgment. In ruling on this motion, I must draw all inferences in the defendant's, or non-moving party's, favor. *Douglas v. York County,* 360 F.3d 286, 290 (1st Cir.2004). To conclude that a less restrictive alternative—segregation rather than strip-searching—existed at the time of the second search of the plaintiff, I would have to take a significant inferential step: that the conditions in March 2000 were the same as when the Jail changed its policy in 2001. Given the requirement that I draw such inferences against the plaintiff, paired with courts' reluctance to rely exclusively on the less restrictive alternative consideration, I am unwilling to grant summary judgment to the plaintiff.[6]

---

**6.** There is no evidence in the record on the question of whether the segregation policy could have been implemented at the time of the March 2000 second strip-search. This paucity of evidence might be a result of the defendants' strategic unwillingness to contro- vert the feasibility of implementing segregation earlier, which would have resulted in the admissibility of the policy change under the feasibility exception to Rule 407. The most the defendants have said on the topic is their

## B. *Manner*

■ As for the manner in which the search was conducted—the remaining *Bell* reasonableness factor left unexamined by my August 2005 Memorandum and Order—courts have considered whether or not a prisoner is required "to assume humiliating poses, expose [him- or herself] in an unnecessarily public place or to members of the opposite sex, remain exposed for unreasonable durations, or endure degradation or ridicule." *United States v. Cofield*, 391 F.3d 334, 337 (1st Cir.2004). In the absence of such factors or any suggestion of "abusive or unprofessional motivation on the part of the officers," courts have held the manner in which a search is conducted to be reasonable. *Id;* *see also Roberts*, 239 F.3d at 113 (finding the manner of search reasonable when conducted in private, search was entirely visual, and no accusations of abuse); *Burns v. Loranger*, 907 F.2d 233, 235 & n. 6 (1st Cir.1990) (noting plaintiff did not challenge manner of strip-search, where visual search only, performed by officer of same gender in a private location).

In the case at bar, the plaintiff alleges that at the time of the second strip-search, at least four women were present, including another female detainee and additional Jail employees. Defendants admit that the plaintiff may have been searched in the presence of another inmate, but make no admission as to the total number of personnel present during the search.

Given the disagreement between the parties with respect to the number and identities of other people present during the search, I conclude that summary judgment is inappropriate as to the *Bell* "manner" reasonableness factor as well.

statement that, "[t]heoretically, any specific detainee could be segregated from the general population. However, various factors, including staffing, available space, and the population count would necessarily need to be

## IV. CONCLUSION

For the foregoing reasons, I conclude that my earlier **DENIAL** of the plaintiff's cross-motion for summary judgment [docket entry # 37] was proper. This case will now proceed to trial on the narrow issues of the justification for the second strip-search and the manner in which that search was conducted.

A few suggestions with regard to justification: The parties have already submitted, and this Court has reviewed, evidence concerning the history of contraband and safety problems at the Jail. In the Court's judgment, this area may well be appropriate for stipulated testimony. Likewise, the questions of outside visitor contact, the type of crime with which Gilanian was charged, her mingling with the general population, and the dangerousness of that population have already been covered; I would encourage the parties to stipulate to these issues to the extent they can. The justification inquiry at trial should focus primarily on the question of a less restrictive alternative. Questions relevant to this inquiry include:

· Could the policy change from strip-searching to segregation have been implemented at the time of Gilanian's second March 2000 strip-search?

· What changes, if any, in staffing, space allocation, and budget were necessary for the Jail to switch to segregation after *Roberts?*

· What less restrictive alternatives, other than segregation, might have been available to the Jail in March 2000?

· If the switch to segregation was possible in 2001, how far back in time is it

considered. It is difficult to determine four years after the fact whether Plaintiff could have been segregated." (Def.'s Mem. in Sup't of Mot. for Summ. J. p. 8–9).

proper to assume that the same switch could have been made?

SO ORDERED.